Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 2412 | **DATE** | Jan. 7, 2005 |
| **CASE TITLE** | David E. Ogdon    v    Barry G. Hoyt | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐  Filed motion of [ use listing in "Motion" box above.]
(2)  ☐  Brief in support of motion due _____.
(3)  ☐  Answer brief to motion due_____. Reply to answer brief due_____.
(4)  ☐  Hearing
(5)  ☐  Status hearing
(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7)  ☐  Trial[set for/re-set for] on _____ at _____.
(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
        ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■  [Other docket entry]

Memorandum opinion and order entered. Defendant's motion to dismiss is denied with respect to counts I through III, and is granted with respect to count IV.

(11) ●  [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| X | Notices mailed by judge's staff. | JAN 11 2005 date docketed | |
| | Notified counsel by telephone. | | 26 |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | GMA docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| GS | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**
JAN 1 1 2005

DAVID E. OGDON, )
)
Plaintiff, )
)
v. ) No. 04 C 2412
) Judge Robert W. Gettleman
BARRY G. HOYT, )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

Plaintiff David E. Ogdon ("Ogdon") has filed a four-count amended complaint seeking damages against defendant Barry G. Hoyt ("Hoyt") for allegedly refusing to fulfill the duties of Hoyt's contract with Ogdon to purchase $833,000 worth of Ogdon's shares in a privately-held business of which both parties were owners. This court previously granted in part and denied in part defendant's motion to dismiss plaintiff's initial complaint. See Ogdon v. Hoyt, 2004 WL 1610973 (N.D. Ill. July 19, 2004) (granting defendant's motion to dismiss the fiduciary duty claim, and denying defendant's motion to dismiss the breach of contract, estoppel and quantum meruit claims). Plaintiff filed an amended complaint on September 21, 2004, re-asserting his original claims: (1) breach of contract (Count I); (2) estoppel (Count II); (3) quantum meruit (Count III); and (4) breach of fiduciary duty (Count IV). Defendant has again moved to dismiss all counts pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons stated below, defendant's motion to dismiss is denied with respect to Counts I through III, and defendant's motion to dismiss is granted with respect to Count IV.

26

# FACTS[1]

Defendant Hoyt was CEO and director of Asset Allocation Company ("AAM"), a registered investment advisor that serviced small and medium insurance companies. Plaintiff Ogdon was a senior portfolio manager for AAM. Ogdon stopped working for AAM as a full-time employee as of January 1, 2000, and ended his employment with AAM as of January 1, 2001. Ogdon owned a small portion of AAM's stock. Hoyt owned a large percentage of the business.

In early 2001 a group of investors were interested in buying AAM, and the lead prospective investor was an entity known as Cenco. In the first quarter of 2001, Cenco signed a written Stock Purchase Agreement to purchase up to 33% of an entity that would be created to own the companies and/or revenue streams of AAM and its affiliated companies ("Purchase Agreement"). Six of eight AAM-related entities were consolidated to form the entity called Newco. The two other existing entities, AAM Advisors, Inc. ("AAM Advisors")and AAM Convertibles, Inc. ("AAM Convertibles"), were S corporations that could not be purchased by Cenco, a C corporation, without "adverse consequences." Therefore, all of the contracts of AAM Advisors and AAM Convertibles were transferred to Newco. In return, AAM Advisors and AAM Convertibles received stock in Newco, and that stock became the sole asset of the two S corporation entities.

---

[1] The facts recited herein are those alleged in the complaint which, for purposes of this Rule 12(b)(6) motion, the court accepts as true. Travel All Over the World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1429 (7th Cir. 1996).

Plaintiff and defendant owned 4.6% and 23% of Newco stock, respectively. Under the Purchase Agreement, Cenco was to purchase 25% of Newco by June 2001 and had a six-month option to purchase an additional 8.33% of Newco. The purchase price was $700,000 for each 1% purchased, a 70% premium over "internal valuations." Each owner of Newco shares could sell an equal percent of his shares to Cenco. Cenco expressed no preference as to how the purchase price was distributed among the multiple owners of Newco. For the owners of Newco, however, the amount distributed to each was significant.

In April 2001, one month prior to the closing of Cenco's purchase of 25% of Newco, defendant approached plaintiff about a "side deal." If plaintiff sold his pro-rata shares to Cenco, plaintiff would be selling some of his S corporation holdings. As a shareholder of the S corporation entities defendant wanted to avoid this because a sale by plaintiff to Cenco would create a capital gain for all shareholders of AAM Advisors or AAM Convertibles and subject defendant to capital gains taxes. Further, the sale of more than 2.2% of Newco stock from AAM Advisors by plaintiff to Cenco would make it difficult for defendant to maintain control of the Board of Directors of Newco.

Defendant met with plaintiff on or about April 26, 2001, to discuss defendant's request for a side deal. Peter Mavrogenes ("Mavrogenes"), an AAM shareholder with a large ownership stake, was also present. Plaintiff's amended complaint alleges that at defendant's suggestion plaintiff and defendant agreed that plaintiff would not tender as many shares as plaintiff was entitled to tender. Defendant promised to purchase from plaintiff the amount of shares plaintiff would not be selling to Cenco at the same price promised by Cenco, so that plaintiff would receive the same deal as if he were selling directly to Cenco. At the April 26 meeting

3

Mavrogenes, plaintiff and defendant discussed and quantified the amounts that plaintiff should realize through the sale of his shares and his assets, and reviewed the details of the transaction. Plaintiff and defendant agreed that they would perform their side deal immediately after the completion of the closing of Cenco's purchase of 25% of AAM, and that they would repeat the side deal if Cenco exercised its option to purchase an additional 8.33% of Newco.

According to plaintiff, based on defendant's assurances at the April 26, 2001, meeting, and Mavrogenes's presence as a witness, plaintiff did not insist on having an attorney put the agreement in writing. The side deal did not provide any additional monetary benefit for plaintiff. Plaintiff alleges that at the time of the side deal plaintiff was aware that defendant had "power, superiority and influence" over plaintiff because of "special circumstances" including: (1) defendant's power over more than $1 million of unsecured promissory notes owed to plaintiff by AAM entities; (2) defendant's power over health insurance benefits owed to plaintiff's family; (3) defendant's power with respect to plaintiff's ability to sell other AAM stock; and (4) defendant's ability to "act vindictively" against plaintiff if plaintiff refused the side deal.

On April 27, 2001, plaintiff sent an e-mail to defendant, Mavrogenes, and Darlene Richards[2] ("Richards"), an accountant at AAM, which noted the side deal requested by defendant. The next day, plaintiff sent a follow-up e-mail to defendant and Mavrogenes with two pages detailing the calculations for Cenco's purchase of 25% of Newco. Subsequently, defendant, plaintiff and Mavrogenes reviewed the calculations again. Plaintiff then sent three

---

[2] Although plaintiff's amended complaint refers to Darlene Warner, the e-mails attached to the complaint are addressed to Darlene Richards, and plaintiff's amended complaint later refers to Ms. Richards.

4

follow-up e-mails to defendant, including an e-mail on May 22, 2001, which indicated defendant's preference to purchase AAM Advisors stock in the buyout.

On May 31, 2001, Cenco proceeded with its purchase of 25% of Newco stock. Plaintiff, in reliance on defendant's promise to execute the side deal, tendered fewer shares of Newco to Cenco than he could have. Plaintiff sent an e-mail to defendant, Mavrogenes and Richards on June 1, 2001, confirming figures for the side deal and suggesting June 30, 2001, as the date to complete the transaction. Plaintiff alleges that defendant told him that defendant's accountants were looking at the details of the capitals gains treatment and should be ready "any day." More than a week later, the side deal had not closed. On July 7, 2001, plaintiff sent defendant an e-mail regarding defendant's failure to purchase plaintiff's shares. By that time Cenco had decided to exercise its option to buy an additional 8.33% of Newco, and defendant suggested delaying payment to plaintiff until Cenco's second purchase was complete. Defendant also suggested delaying the second side deal between plaintiff and defendant. Again, in reliance on defendant's promise, plaintiff did not tender to Cenco as many shares as he could have when Cenco purchased the additional 8.33% of Newco. Defendant has not purchased any of plaintiff's Newco stock, and has received $833,000 "that should have been paid to [plaintiff]."

## DISCUSSION

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the complaint, not to rule on its merits. <u>Gibson v. City of Chicago</u>, 910 F.2d 1510, 1520 (7th Cir. 1990). When considering the motion, the court accepts the factual allegations as true and draws all reasonable inferences favorable to the plaintiff. <u>Travel All Over the World, Inc. v. Kingdom of Saudi Arabia</u>, 73 F.3d 1423, 1428 (7th Cir. 1996).

The consideration of a Rule 12(b)(6) motion is generally restricted to the pleadings, which include the complaint, any exhibits attached thereto, and supporting briefs. Thompson v. Illinois Department of Professional Regulation, 300 F.3d 750, 753 (7th Cir. 2002). Nonetheless, "documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the] claim." Venture Associates Corp. v. Zenith Data Systems Corp., 987 F.2d 429, 431 (7th Cir. 1993).

The pleading requirements under Fed. R. Civ. P. 8(a)(2) necessitate only "a short and plain statement showing the plaintiff is entitled to relief, the purpose of which is to give the defendant notice of the claims and the grounds they rest upon." Thompson, 300 F.3d at 753.

## I. Breach of Contract

Count I of plaintiff's first amended complaint re-pleads his breach of contract claim, which alleges that defendant breached the oral contract between plaintiff and defendant to execute a side deal for purchase of plaintiff's Newco shares. This court previously ruled that plaintiff sufficiently alleged the elements of breach of contract, and denied defendant's motion to dismiss the claim under Rule 12(b)(6). Ogdon, 2004 WL 1610973, at *3. In the instant motion, defendant raises for the first time the argument that plaintiff's breach of contract claim is barred by the statute of frauds.[3] For the reasons discussed herein, the court finds that the statute of frauds is not applicable to the alleged oral contract and denies defendant's motion to dismiss Count I.

---

[3]Defendant fails to explain why it did not raise this issue in its initial motion to dismiss Counts I, II, and III of the original complaint, and the court can discern no good reason to piecemeal these attacks on the pleadings.

The statute of frauds has been held by Illinois courts to be a proper basis for dismissal under Rule 12(b)(6). See Perminas v. Novartis Seeds, Inc., 2000 WL 1780249, at *2 (N.D. Ill. Dec. 4, 2000). Illinois's statute of frauds for the sale of goods states, "Except as otherwise provided in this Section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and is signed by the parties against who enforcement is sought." 810 ILCS 5/2-201(1). Defendant argues that because the alleged oral contract between plaintiff and defendant involves goods - the Newco shares - worth more than $500, it is barred by the Illinois statute of frauds.

Plaintiff counters that sales of stock are specifically exempted from the Illinois statute of frauds by a 1996 amendment that added 810 ILCS 5/8-113, which is titled "Statute of frauds inapplicable" and is identical to §8-113 of the Uniform Commercial Code ("UCC"). The new section states, "A contract or modification of a contract for the sale or purchase of a security is enforceable whether or not there is a writing signed or record authenticated by a party against whom enforcement is sought, even if the contract or modification is not capable of performance within one year of its making." 810 ILCS 5/8-113. Defendant argues that §5/8-113 applies only to transactions involving the "New York Stock Exchange or other exchanges that deal in publicly-traded securities." Plaintiff responds that §5/8-113 is not limited to publicly-traded securities, and applies to agreements for the sale of all securities, including privately-held securities.

The Supreme Court recently noted that oral contracts for the sale of securities are sufficiently common that UCC §8-113 and statutes of frauds in every State now consider them

7

enforceable. Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc., 532 U.S. 588, 595 (2001)(compiling state statutes). The Official Comment to UCC §8-113 states:

> "This section provides that the statute of frauds does not apply to contracts for the sale of securities, reversing prior law which had a special statute of frauds in Section 8-319(1978). With the increasing use of electronic means of communication, the statute of frauds is unsuited to the realities of the securities business. For securities transactions, whatever benefits a statute of frauds may play in filtering out fraudulent claims are outweighed by the obstacles it places in the development of modern commercial practices in the securities business." UCC §8-113:1R.

Section 5/8-113 of the Illinois UCC is identical to UCC §8-113, and the Illinois statute includes the UCC Official Comment with no additional State comment. 810 ILCS 5/8-113, cmt.

It appears that no Illinois court has construed Illinois's §5/8-113, but at least one court in this district has applied §8-113 of the Delaware UCC, which is identical to the Illinois statute, to the fraudulent transfer of privately held shares in a family business. Parsons Tanning Co. v. Schwartz, 2004 WL 1593909, at *5 (N.D. Ill. July 15, 2004). Although UCC §8-113 has been adopted by all fifty states, few courts have construed the new provision. Wharf appears to be the only Supreme Court opinion that addresses UCC §8-113 and does so only in dicta. The Wharf majority cites to the UCC Official Comment to §8-113, specifically the statement that "[t]he statute of frauds is unsuited to the realities of the securities business," in support of the Court's finding that oral contracts are not excluded as a class from coverage by §10(b) of the Securities Exchange Act of 1934.[4] Defendant here extrapolates from this citation that "even the Supreme Court views §8-113 as enacted in order to address the impracticalities associated with requiring a

---

[4]Of course, §10(b) applies to transactions involving privately as well as publicly held securities. Matheson v. Armbrust, 284 F.2d 670, 674 (9th Cir. 1960), cert. denied 365 U.S. 870 (1961); Northern Trust Co. v. Essaness Theaters Corp., 103 F. Supp. 954, 960 (N.D. Ill. 1952).

8

written contract when buying or selling stock through a stock exchange or the over-the-counter securities market," and therefore the exemption from the statute of frauds applies to publicly-traded securities only. Defendant's argument reads too much into the language of the UCC Official Comment cited by the Supreme Court, and too little into the unambiguous statutory language of §5/8-113

Defendant cites to two other courts that have interpreted state statutes identical to UCC §8-113 to limit the exemption from the statute of frauds to stocks traded on public exchanges such as the New York Stock Exchange. The strongest case in defendant's favor is Byrd v. Bentley, 850 So. 2d 232 (Ala. 2002), in which the Alabama Supreme Court expressly limited Alabama's §8-113 to transactions in the organized securities market. Id. at 237-38. Byrd is distinguishable, however, because the Alabama UCC statute contains a State comment in addition to the UCC Official Comment that specifies that Alabama's §8-113 is applicable only to transactions in the organized securities market. Ala. Code 1975 §7-8-113, cmt. The Alabama comment states:

> "[T]he Alabama general Statute of Frauds, Section 8-9-2, Code of Alabama, has been amended to make its requirements applicable to agreements for the sale or purchase of securities other than through a stock exchange or the over-the-counter market... . Thus an agreement by a shareholder of a closely held corporation to sell all or a part of his shares continues to be subject to the statute of frauds, notwithstanding the elimination of a statute of frauds requirement as to transactions in the organized securities markets." Id.

Unlike the Alabama statute, Illinois's §5/8-113 does not contain an additional State comment.[5]

---

[5]The court's review of the relevant UCC statutes of several other states found that all of the states examined also contain only the language of the UCC comment or no comment at all. See, e.g., A.R.S. § 47-8113 (Ariz.); CA. Com. Code § 8113 (Cal.); C.R.S.A. § 4-8-113 (Colo.); 6 Del.C. §8-113 (Del.); NY U.C.C. §8-113 (N.Y.); M.G.L.A. 106 § 8-113 (Mass.); Neb. Rev. St. U.C.C. § 8-113 (Neb.); N.D.C.C. 41-08-13 (N.D.); 12A Okl. St. Ann. § 8-113 (Okla.); 9A
(continued...)

Defendant also cites <u>Spencer Trask Software and Info. Services v. RPost Int'l Ltd.</u>, 2003 WL 169801 (S.D.N.Y. Jan. 24, 2003), which involved an alleged oral contract for a complex, multi-party, multi-step financing transaction that included the purchase of non-publicly traded stock. New York courts have identified four factors to be considered in determining whether parties to a preliminary agreement, which calls for the execution of a formal instrument, intended to be bound in the absence of such an executed final instrument. <u>Id.</u> at *10. One of the factors is whether the transaction is the type typically reduced to writing. <u>Id.</u> The plaintiffs in <u>Spencer</u> argued that the type of transaction at issue was not typically reduced to writing, and cited to <u>Wharf</u> and §8-113 in support of their argument that oral contracts for the sale of securities are common. In the context of analyzing the parties' intent to be bound by the alleged oral contract, the <u>Spencer</u> court rejected the plaintiffs' argument, explaining that "it is not likely that those sufficiently common oral contracts for the sale of securities, to which the Supreme Court was referring, were intended to encompass such a complex transaction." <u>Id.</u> The <u>Spencer</u> court noted, however, that the plaintiffs might be able to establish that the agreement was exempted from the statute of frauds under §8-113 as an agreement for the sale of securities. <u>Id.</u> <u>Spencer</u> therefore provides little, if any, support for defendant's argument that the statute of frauds should apply in the instant case.

In the instant case, although the court does not understand plaintiff's statement that defendant's §5/8-113 argument is "so wrong it is false," the court finds that pursuant to the clear language of 810 ILCS §5/8-113 the statute of frauds does not apply to sales of securities,

---

⁵(...continued)
V.S.A. §8-113 (Vt.).

regardless of whether the trade is made on a securities exchange. See Estate of Cowser v. Comm'r of Internal Revenue, 736 F.2d 1168, 1171 (7th Cir. 1984) ("It is a common rule of statutory construction that when the plain language of a statute is clear, courts need look no further than those words in interpreting the statute"). Further, Illinois's §8-113, unlike the Alabama statute, does not contain a limiting State comment. A plain reading of Illinois's §5/8-113 establishes that it applies generally to all sales of securities, and exempts the entire class of transactions from the statute of frauds. The Illinois statute of frauds, therefore, does not apply to the oral contract alleged by plaintiff.

Accordingly, the court denies defendant's motion to dismiss Count I. Because the court finds that the statute of frauds does not apply to the oral agreement alleged here, the court need not reach defendant's alternative arguments under the statute of frauds.

**II.  Estoppel**

Count II of plaintiff's first amended complaint re-pleads his promissory estoppel claim. This court previously ruled that plaintiff sufficiently alleged the elements of promissory estoppel, and denied defendant's motion to dismiss the claim under Rule 12(b)(6). Ogdon, 2004 WL 1610973, at *3. In the instant motion, defendant raises for the first time the argument that plaintiff's promissory estoppel claim is barred by the statute of frauds. As discussed above, the statute of frauds does not apply to the alleged oral agreement in the instant case. Accordingly, defendant's motion to dismiss is denied as to Count II.

**III.  Quantum Meruit**

Count III of plaintiff's first amended complaint re-pleads his quantum meruit claim. This court previously ruled that plaintiff sufficiently alleged the elements of quantum meruit, and

11

denied defendant's motion to dismiss the claim under Rule 12(b)(6). Ogdon, 2004 WL 1610973, at *4. In the instant motion, defendant raises for the first time the argument that plaintiff's quantum meruit claim is barred by the statute of frauds. As discussed above, the statute of frauds does not apply to the alleged oral agreement in the instant case.

Defendant also argues that plaintiff fails to plead the elements of a quantum meruit claim because Count III is concerned with shares of stocks. Plaintiff contends that stocks are goods and that the provision of services is a necessary element of a quantum meruit claim. Defendant's argument in the instant motion is merely a recasting of his argument in his earlier motion to dismiss the initial complaint. This court previously rejected defendant's argument that plaintiff failed to sufficiently plead the elements of a quantum meruit claim, and plaintiff's amended complaint contains the same allegations in support of his quantum meruit claim as his initial complaint. Accordingly, defendant's motion to dismiss is denied as to Count III.

## IV. Breach of Fiduciary Duty

Count IV of plaintiff's amended complaint re-pleads his state-law breach of fiduciary duty claim, asserting that defendant breached his fiduciary duty to plaintiff when defendant failed to execute the side deal. This court previously ruled that plaintiff had not sufficiently alleged a fiduciary relationship, and granted defendant's motion to dismiss the claim under Rule 12(b)(6). Ogdon, 2004 WL 1610973, at *4. Plaintiff's amended complaint includes new factual allegations in support of plaintiff's argument that a fiduciary duty existed between plaintiff and defendant. Because plaintiff again fails to allege a fiduciary relationship between plaintiff and defendant, the court grants defendant's motion to dismiss Count IV.

Under Illinois law, a plaintiff may recover for breach of fiduciary duty where: "(1) a fiduciary duty exists on defendant's part; (2) the defendant breached that fiduciary duty; and (3) damages proximately resulted from the breach." Pope v. Smith-Rothchild Financial Co., 2003 WL 21994023, at *2 (N.D. Ill. Aug. 21, 2003) (citation omitted). Defendant argues that the amended complaint fails to allege a fiduciary relationship. Plaintiff counters that the nature of the transaction between plaintiff and defendant created a principal-agent or trustee-beneficiary relationship, where a fiduciary duty exists as a matter of law. See Prime Leasing, Inc. v. Kendig, 332 Ill. App. 3d 300, 314 (1st Dist. 2002). Plaintiff argues in the alternative that the special circumstances of the parties' transaction created a fiduciary relationship.

A fiduciary duty may arise as a matter of law from the existence of a particular relationship, such as an attorney-client or principal-agent relationship. See Ransom v. A.B. Dick, Co., 289 Ill. App. 3d 663, 672 (1st Dist. 1997). Plaintiff claims that the relationship between plaintiff and defendant "mirrors the situations in which the fiduciary rules are always applied" and is "properly labeled as a principal and agent relationship or a trustee and beneficiary relationship," and should be analyzed as fiduciary as a matter of law. Plaintiff's amended complaint, however, does not allege any facts that support the existence of a principal-agent or trustee-beneficiary relationship. Instead, plaintiff makes conclusory statements such as, "the substance of the transaction was such that Mr. Hoyt would act as agent or trustee for Mr. Ogdon." In support of his argument that the court should imply a fiduciary relationship as a matter of law where none is explicitly alleged, plaintiff merely cites to one Seventh Circuit case, Cook, Inc. v. Boston Scientific Corp., 333 F.3d 737 (7th Cir. 2003), for the general proposition that courts should focus on the "economic substance" of transactions rather than the formal

13

terms. Cook did not involve a fiduciary relationship, and the Cook court's findings about contract interpretation do not support, or even relate to, plaintiff's argument here.

Plaintiff argues in the alternative there was a de facto fiduciary relationship between the parties because "the side-deal was one sought by Hoyt solely for his benefit" and because defendant describes plaintiff and him as "partners." When the relationship between the parties is not one that gives rise to a fiduciary relationship as a matter of law, the party asserting the existence of the relationship has the burden of establishing such by clear and convincing evidence. Ransom, 289 Ill. App. 3d at 672. A party alleging the existence of a fiduciary relationship "must prove that it 'is heavily dependent upon the advice of another' in order to establish such a duty." Prescott v. Allstate Life Ins. Co., 341 F. Supp. 2d 1023, 1024 (N.D. Ill. 2004) (citations omitted).

Courts of this district have repeatedly held that a contractual relationship alone does not normally create a fiduciary duty. See e.g., Id.; Pope v. Smith-Rothchild Financial Co., 2003 WL 22889377, at *3 (N.D. Ill. Dec. 8, 2003) (citing Oil Express Nat'l, Inc. v. Latos, 966 F. Supp. 650, 650-51 (N.D. Ill. 1997)). Under certain circumstances, however, a fiduciary duty may develop between contracting parties. Id. Factors that suggest a fiduciary relationship include "the degree of business experiences between the parties," Oil Express, 966 F. Supp. at 651, and the "extent to which the allegedly subservient party entrusts the handling of his business and financial affairs to the other...," In re Estate of Wernick, 151 Ill. App. 3d 234, 244 (1st Dist. 1986). "[M]ere allegations that one businessman simply trusted another to fulfill his contractual obligations is certainly not enough" to establish such a duty. Carey Elec. Contracting, Inc. v. First Nat'l Bank of Elgin, 74 Ill. App. 3d 233, 238 (2nd Dist. 1979).

14

"[T]he touchstone of a fiduciary relationship is the presence of a significant degree of dominance and superiority of one party over another." Zurich Capital Markets Inc. v. Coglianese, 332 F. Supp. 2d 1087, 1121 (N.D. Ill. 2004) (quoting Lagen v. Balcor Co., 274 Ill. App. 3d 11, 21 (2nd Dist.1995). Allegations that one party trusted another to fulfill its contractual obligations, or that one party was in a dominant business position do not constitute such a special circumstance to turn a formal, contractual relationship into a fiduciary relationship. See Ward Enterprises, Inc. v. Bang & Olufsen America, 2003 WL 22859793, at *2 (N.D. Ill. Dec. 2, 2003); Oil Express Nat'l, Inc. v. Burgstone, 958 F. Supp. 366, 370 (N.D. Ill. 1997). In the instant case, plaintiff includes additional allegations in his amended complaint in an attempt to establish that defendant exerted extraordinary influence and dominance over plaintiff, including that defendant owed plaintiff over $1 million in promissory notes, controlled plaintiff's health insurance and plaintiff's future ability to sell other AAM shares, and could "act vindictively" against plaintiff if plaintiff refused the side deal. These new allegations do not cure the insufficiencies of the initial complaint because they do no rise to the level of superiority and dependence required to transform a contractual relationship between sophisticated businessmen dealing at arms length into a fiduciary relationship.

Therefore, because plaintiff has not sufficiently pled the existence of a fiduciary relationship, the court grants defendant's motion to dismiss Count IV.

## CONCLUSION

For the reasons stated herein, defendant's motion to dismiss is denied with respect to Counts I through III, and granted with respect to Count IV.

**ENTER:** **January 7, 2005**

**Robert W. Gettleman**
**United States District Judge**